IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| SCIENCE APPLICATIONS ) | |
| INTERNATIONAL CORPORATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 1:08cv443 (JCC) |
| ) | |
| CACI-ATHENA, INC. ) | |
| ) | |
| Defendant. ) | |

### **M E M O R A N D U M   O P I N I O N**

This matter is before the Court on Plaintiff's Emergency Motion for a Temporary Restraining Order against Defendant. For the following reasons, the Court will grant Plaintiff's Motion.

### **I.  Background**

Since June 2007, Plaintiff Science Applications International Corporation ("SAIC") and Defendant CACI-Athena, Inc. ("Athena") have worked together to provide services to the U.S. Government for the "Counter Improvised Explosive Device Targeting Program" ("CITP"). The CITP work involves intelligence support services in Iraq and Afghanistan to aid the U.S. military in combating enemy tactics and anti-personnel devices. SAIC provides intelligence analysts and other highly specialized personnel to perform the CITP work, and a substantial portion of

these personnel are Athena employees. The CITP work is performed through a prime contract called the "Omnibus Rapid Labor Service Support Requirements" contract (the "Omnibus Contract"). Athena works under a subcontract with SAIC, which consists of general terms and conditions entered into in 2006 and a more specific agreement particular to the CITP work.

In October 2007, Athena was set to be acquired by CACI, Inc. - Federal ("CACI-Federal"), one of SAIC's primary competitors. As Athena's subcontract with SAIC for the CITP work was scheduled to expire immediately prior to the acquisition, Athena asked SAIC to extend the subcontract until 2008. SAIC agreed, on the condition that Athena make a "reasonable, good faith effort" to maintain the contractual relationship with SAIC for the "follow-on" efforts of the CITP work, even if that work was procured under "another contract vehicle." *See* Subcontract Modification, Ex. 3 to Pl.'s Emergency Mot. for a TRO. Both parties also agreed not to undertake any action that would undermine their relationship. *Id.* The Subcontract Modification was executed on October 29, 2007, and Athena was purchased by CACI-Federal on November 1, 2007.

Presently, the Government is procuring the follow-on CITP work by issuing a "Request for Proposals" ("RFP") under another contract called the "Defense Intelligence Agency Solutions for Intelligence Analysis Omnibus Contract" (the "SIA

2

Omnibus Contract"). The RFP was issued April 29, 2008, and proposals are due by 2:00 p.m. on May 19, 2008. The SIA Omnibus Contract will be a one-year contract worth about $60 million in revenue, with four option years pushing the total potential value to $300 million. According to SAIC, Athena agreed in the Subcontract Modification that it would be SAIC's subcontractor in the proposal that SAIC submits for this follow-on CITP work. Athena, reading the Subcontract Modification differently, has chosen not to team with SAIC on the SIA Omnibus Contract proposal.

SAIC contends that it has no reasonable way of submitting a competitive proposal for all of the Government's needs without its ability to propose Athena as its subcontractor. As a result, SAIC filed a Complaint against Athena in Fairfax County Circuit Court on May 2, 2008, alleging breach of contract and requesting immediate injunctive relief. On May 6, 2008, Athena removed the case to this Court. That same day, SAIC filed the instant Emergency Motion for a Temporary Restraining Order ("TRO"), seeking an order requiring Athena to honor its contract with SAIC and preventing it from assisting another prime contractor in preparing a bid on the SIA Omnibus Contract. A hearing on the Motion was held on May 8, 2008. This Motion is currently before the Court.

## II. Standard of Review

The issuance or denial of a preliminary injunction or temporary restraining order "is committed to the sound discretion of the trial court." *Quince Orchard Valley Citizens Ass'n, Inc v. Hodel*, 872 F.2d 75, 78 (4th Cir. 1989). In determining whether an injunction is appropriate, a district court must apply the "balance-of-hardship" test. *See Blackwelder Furniture Co. v. Seilig Mfg. Co., Inc.*, 550 F.2d 189, 194 (4th Cir. 1977); *Railway Labor Executives' Ass'n v. Wheeling Acquisition Corp.*, 736 F. Supp. 1397, 1401-02 (E.D. Va. 1990) (Ellis, J.) (applying *Blackwelder* test to determine issuance of temporary restraining order).

Under the test, a court should examine the following four factors: (1) the likelihood of irreparable harm to the plaintiff if the injunction is denied; (2) the likelihood of harm to the defendant if the injunction is granted; (3) the plaintiff's likelihood of success on the merits; and (4) the public interest. *See Hughes Network Systems, Inc. v. InterDigital Comm'n Corp.*, 17 F.3d 691, 693 (4th Cir. 1994); *Blackwelder Furniture*, 550 F.2d at 193-96. No single factor can defeat a motion for a preliminary injunction or a TRO. Rather, "[t]he decision to grant or deny a preliminary injunction depends upon a 'flexible interplay' among all the factors considered." *Blackwelder Furniture*, 550 F.2d at 196. However, if after

balancing irreparable harm to the plaintiff against harm to the defendant the balance "tips decidedly" in favor of the plaintiff, a preliminary injunction will be granted if "the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812-13 (4th Cir. 1991)(quoting *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 359 (4th Cir. 1991)).

### III. Analysis

In carefully considering the factors of the *Blackwelder* test, for the reasons stated below, the Court will grant SAIC's Emergency Motion for a TRO.

#### A. Likelihood of irreparable harm to SAIC if the TRO is not granted

SAIC contends that without a TRO requiring Athena to act as SAIC's subcontractor it will lose the opportunity to compete for the follow-on CITP work and will have to forego the substantial revenue that this large and important federal contract would bring. As a result, SAIC might have to lay off employees in whom it has made significant training and educational investments. SAIC also argues that it will lose other intangible benefits of the CITP work, including goodwill and opportunities for future Government work.

The Fourth Circuit has held that the loss of an opportunity to bid on a military contract does not constitute irreparable harm. *James A. Merritt and Sons v. Marsh*, 791 F.2d 328, 331 (4th Cir. 1986). However, other courts, including the U.S. Court of Federal Claims and this Court, have held that "a lost opportunity to compete on a level playing field for a contract" is a sufficient basis for finding irreparable harm. *Serco, Inc. v. Untied States*, __ Fed. Cl. __, 2008 WL 623803, at *32 (Fed. Cl. Mar. 5, 2008); *PGBA, LLC v. United States*, 57 Fed. Cl. 655, 664 (2003)(noting that "a lost opportunity to compete may constitute an irreparable harm"); *Overstreet Elec. Co., Inc. v. United States*, 47 Fed. Cl. 728, 744 (2000)(finding that the potential loss of valuable business on a contract, "deriving from a lost opportunity to compete in a fair competitive bidding process for a contract," is sufficient to prove irreparable harm); *Dairy Maid Dairy, Inc. v. United States*, 837 F. Supp. 1370, 1381 (E.D. Va. 1993)(citing *United Power Corp. v. United States Defense Mapping Agency*, 736 F. Supp. 354, 357-58 (D.D.C. 1990))(stating that "the loss of a major contract" constitutes an irreparable injury). The Court, while noting the binding nature of *Merritt* in contrast to the other precedent cited, is persuaded by SAIC's argument that *Merritt* is distinguishable on the ground that Merritt's claim was doomed by its lack of specificity with respect to his lost opportunities. In this case, by contrast, it is plain that SAIC is being deprived of the opportunity to bid on

a particular contract – the SIA Omnibus Contract. Given the weight of the law, the Court finds that the loss of the opportunity to bid on a specific contract constitutes irreparable harm, and that SAIC will incur such harm absent a TRO.

SAIC also contends that an injunction is appropriate because the harm it will suffer from the lost opportunity to submit a competitive proposal cannot be adequately compensated by money damages, which it claims are too difficult to calculate. SAIC argues that its other injuries, such as lost future opportunities and goodwill, are similarly immeasurable. Athena counters that SAIC's alleged damages can be precisely quantified, and in fact were so quantified in SAIC's Complaint.

The Fourth Circuit has made the general proclamation that irreparable harm is likely to exist where it is impossible to "ascertain[] with any accuracy the extent of the loss." *Blackwelder*, 550 F.2d at 197. This includes situations where the plaintiff "could not be compensated by money damages alone." *Bowe Bell & Howell Co. v. Harris*, 145 Fed. Appx. 401, 404 (4th Cir. 2005). The Court agrees with SAIC's contention that money damages would be too difficult to quantify given the uncertainty of facts such as the winning price of the contract, the number of services the Government will order over time, and how many of the four option years the Government will choose to exercise. While there is a "reluctance to award preliminary injunctions where the harm at issue can be remedied by an award of money damages at

judgment," *Hughes Network Sys. v. Interdigital Communications Corp.*, 17 F.3d 691, 693 (4th Cir. 1994), the Court finds that SAIC's alleged injuries cannot be undone through monetary remedies and it that will incur irreparable harm without a TRO.

### B.  **Likelihood of harm to Athena if the TRO is granted**

Athena's chief argument that it will suffer irreparable harm if the TRO is granted is based on its contention that the Government rule prohibiting the teaming of prime contractors would bar a SAIC/Athena joint bid.  The Government rule in question is a provision of the RFP that prohibits prime contractors like SAIC from teaming with other prime contractors. This rule would, for example, prohibit SAIC from teaming with CACI-ISS, Inc. ("CACI-ISS"), another wholly-owned subsidiary of CACI-Federal and a prime contractor.  Athena contends that SAIC's earlier decision to obtain a waiver from the Government on this rule is evidence that SAIC acknowledges that pairing with Athena would violate the rule.

However, an email dated April 28, 2008 from the Contracting officer to Janet V. LaFever ("Ms. LaFever"), the Vice President and Director of Contracts for SAIC, indicated that a waiver would not be required if the company SAIC was interested in pairing with "is a separate and distinct entity" from any of the prime contractors.  Ex. 9 to Declaration of Janet V. LaFever ("LaFever Decl.").  According to the Federal Acquisition

8

Regulation ("FAR"), "[b]usiness concerns are affiliates . . . if . . . either one controls or has the power to control the other, or another concern controls or has the power to control both." 48 C.F.R. § 19.101. The FAR then states that "[a]ffiliated concerns . . . are normally considered separate entities." *Id.* § 9.104-3. Applied here, Athena and CACI-ISS are commonly-owned affiliates of CACI-Federal, and are thus considered "separate entities" under the FAR regulations as well as under the teaming rule. Therefore, the Court finds that a SAIC/Athena pairing would not violate the teaming rule.

In addition, SAIC contends that an injunction would not cause Athena any harm because it would simply require Athena to perform its obligations under the Subcontract Modification and to compete for the follow-on CITP work as SAIC's subcontractor. An injunction that merely commands a party to perform its contractual obligations does no harm to that party. *JTH Tax, Inc. v. Lee*, 514 F. Sup. 2d 818, 825 (E.D. Va. 2007); *A.P. Moller-Maersk A/S v. Escrub Sys., Inc.*, 2007 WL 4562827, at *3 (E.D. Va. Dec. 21, 2007). SAIC further argues that, were the Court not to grant the TRO, Athena would join with CACI-ISS to make a proposal on the follow-on CITP work. In other words, Athena would end up roughly in the same place regardless of the Court's decision. The Court agrees. Consequently, the Court finds that the balance of the harms weighs in favor of SAIC.

9

### **C.  SAIC's likelihood of success on the merits**

SAIC argues that it as least likely, and more realistically certain, to succeed on the merits of its breach of contract claim.  According to SAIC, Athena agreed in the Subcontract Modification to make "reasonable, good faith efforts" to "maintain" the relationship of SAIC as the prime contractor and Athena as the subcontractor for the follow-on CITP work.  *See* Subcontract Modification, Ex. 3 to Pl.'s Emergency Mot. for a TRO.  Athena further promised that it would not take "any action," including any action to "induce the Government," that would undermine the SAIC/Athena prime/subcontractor relationship.  *Id.*  SAIC argues that the current competition for the SIA Omnibus Contract constitutes the "follow-on effort" to the existing CITP work ordered through "another contract vehicle" that was envisioned by the Subcontract Modification.  SAIC alleges that Athena breached its obligations by refusing to be SAIC's subcontractor for the follow-on CITP work and by joining CACI in a proposal to the Government asking that a contract be awarded to CACI and Athena.  While Athena challenges this interpretation of the Subcontract Modification, the Court finds that SAIC's reading is the more plausible one.  Moreover, as explained above, Athena's contention that the teaming rule would render the Subcontract Modification unenforceable as a matter of federal contracting law is unpersuasive.  As such, the Court finds that

SAIC has shown a substantial likelihood of succeeding on the merits.

### D.  The public interest

As a general rule, the public has a strong interest in seeing parties abide by their contractual commitments.  *See, e.g., NaturaLawn of Am., Inc. v. West Group, LLC,* 484 F. Supp. 2d 392, 404 (D. Md. 2007); *UBS Painewebber, Inc. v. Aiken*, 197 F. Supp. 2d 436, 448 (W.D.N.C. 2002); *Smith v. Newport News Shipbuilding Health Plan, Inc.*, 148 F. Supp. 2d 637, 653 (E.D. Va. 2001).  SAIC argues that the public has a strong interest in permitting the incumbent contractors on the CITP work, whose acquired knowledge and experience over the past year is of incredible value to U.S. military personnel, to submit a proposal.  Athena counters that the public interest is in fact best served when contracting teams actually want to work as a team, rather when they are forced to serve together by judicial fiat.  Athena also argues that the public interest would be best served by maximizing the Government's contracting options instead of forcing Athena to team with SAIC.  While Athena raises strong points, the Court finds that the strongest interest here is the interest in seeing parties abide by their contractual commitments.

In sum, after a careful balancing of all four *Blackwelder* factors, the Court finds that those factors weigh in favor of granting SAIC's Emergency Motion for TRO.

11

**IV. Conclusion**

For the reasons stated above, the Court will grant SAIC's Emergency Motion for a Temporary Restraining Order.

An appropriate Order will issue.

May 8, 2008                             _____/s/_____
Alexandria, Virginia                            James C. Cacheris
                                     UNITED STATES DISTRICT COURT JUDGE